# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-1145

_____

United States of America

*Plaintiff - Appellant*

v.

Mersed Dautovic

*Defendant - Appellee*

_____

No. 13-1493

_____

United States of America

*Plaintiff - Appellee*

v.

Mersed Dautovic

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 18, 2013
Filed: August 14, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

A jury found Des Moines, Iowa, Police Officer Mersed Dautovic guilty of willfully depriving Octavius Bonds of the right to be free from the use of unreasonable force, in violation of 18 U.S.C. §§ 2 and 242, and knowingly falsifying a police report with the intent to obstruct justice, in violation of 18 U.S.C. §§ 2 and 1519. Dautovic was sentenced to 20 months' imprisonment. The government appeals, arguing that the sentence is substantively unreasonable. We reverse and remand for resentencing. We deny Dautovic's conditional cross-appeal, wherein he argues that the district court erred in applying the enhancement for physical restraint and in denying a downward departure.

I.

On September 12, 2008, Erin Evans and her boyfriend, Octavius Bonds, went on a date. Evans is a petite woman, standing five feet, four inches tall. Bonds, who at the time weighed between 230 and 240 pounds, is approximately six feet, eight inches tall. Evans and Bonds were in their early twenties, and neither had a criminal history. The young couple had gone to the movies that night, and they left the theater around midnight. Evans drove her father's two-door red car. The front passenger seat was broken, so Bonds sat in the back seat. Traffic near the theater was congested, and a light rain was falling.

At 11:00 p.m. on September 12, 2008, Dautovic and officer John Mailander began a four-hour shift working security detail at an apartment complex in Des Moines, Iowa. Both men were wearing police uniforms, and Dautovic drove a

marked police car. Shortly after midnight, Dautovic and Mailander left their patrol area to respond to a call approximately five miles away. Dautovic activated the car's emergency lights and siren and sped toward the call. While en route, they approached Evans's car in the left lane. The car did not move to the right lane immediately. Mailander testified that the car yielded less than five seconds after the police car approached. Evans testified that she could not pull over immediately because there were cars in the right lane, but that she pulled into a left turn lane as soon as she was able to do so.

Shortly thereafter, dispatch reported that other officers had responded to the call and no further assistance was needed. Dautovic and Mailander pulled into a gas station parking lot and decided to stop Evans for failure to yield to an emergency vehicle. When her car passed by the lot, Dautovic activated the emergency lights and siren, and Evans pulled over to the right curb lane immediately.

Dautovic exited the squad car and quickly approached the driver's side of Evans's car. Evans began rolling down her window, and as she was doing so, Dautovic yanked open the driver's side door. According to Evans, Dautovic yelled, "Are you from America?" He asked Evans if she was stupid and "didn't [she] know [she] was supposed to yield to the right when [she saw] an emergency vehicle approaching[?]" Evans testified that she was confused and overwhelmed. She did not understand why Dautovic was yelling at her.

Dautovic had reached Evans's car before Mailander had exited the police car. Mailander approached the driver's side of the car and leaned into the vehicle, yelling for Evans to produce her license, registration, and insurance. Dautovic continued to yell at Evans. Evans was upset, but she nonetheless began looking through her glove compartment for the papers. She also grabbed her cell phone and tried to call her mother. Bonds, whom the officers had not seen because he was seated in back, reached to the front of the car to try to comfort Evans and help her find the papers.

Evans leaned towards the passenger side of the vehicle, as Mailander tried to grab her. Mailander unholstered his OC spray (also known as pepper spray or mace), reached into the car, and threatened to spray Evans if she did not exit the car. At that point, Bonds reached forward to protect Evans's face, either by covering it with his hands or by moving Mailander's hand. Only then did the officers realize that there was a passenger in Evans's car. Mailander testified that he then pulled Evans out of the car, dragged her along the ground to the hood of the police car, placed her in handcuffs, and "slung her towards the curb up into the grass." Evans suffered a sprained wrist and road rash to her legs.

While Mailander was taking Evans into custody, Bonds began to pull himself out of the driver's side door. Dautovic ordered Bonds to get back into the car. When Bonds did not do so and instead stood in the open door, Dautovic deployed his OC spray. Bonds testified that Dautovic continuously sprayed him with the OC as Dautovic "walked from the trunk all the way down to the [door of the car], he walked me down with the mace." Bonds turned away from Dautovic and placed his hands on top of Evans's car. According to Bonds, he asked Dautovic to stop spraying, but made no aggressive moves or threatening statements. The rain had formed a puddle on the roof of the car, which Bonds was using to wipe his eyes, when Dautovic "reached under [Bond's] right arm with the can of mace . . . and sprayed [Bonds] directly in the face." Bonds testified that he grabbed Dautovic's arm "pulled it into my chest and I asked him to stop, please stop, stop. [Dautovic] was still holding the trigger, and I pulled his arm over this way . . . that's when [Dautovic] got maced." Bonds testified that he let go of Dautovic's arm and put his hands back onto the car's roof. He could hear Evans screaming for help.

Bonds remembers being hit on the back of his head before he lost consciousness and collapsed into Evans's car. He awoke as he was being pulled out of the car. His head hit the pavement, and he lost consciousness again. When he awoke, he saw Dautovic and Mailander with their batons drawn. Bonds testified that

-4-

he went into a fetal position to protect himself as the officers struck him. He could not remember how many times he was hit. After Bonds was face down and handcuffed, Dautovic placed a knee on the back of Bonds's neck and applied pressure. Bonds testified that after he told Dautovic that he could not breathe, Dautovic "proceeded to grind [his knee] even harder in the back of my neck."

Three witnesses to the beating testified at trial. They all testified that Bonds was not resisting arrest or acting aggressively towards the officers. One witness said that Bonds tried to protect his head, but that "[h]e never fought at all, the whole entire time." They heard Evans scream, describing it as "terrified" and "like a person screaming for [her] life."

Mailander remembers the incident somewhat differently. He testified that when Dautovic deployed his OC spray, Bonds "had his hands up about chest high, fists clenched." After Bonds's and Dautovic's arms became entangled, Mailander drew his ASP baton and struck Bonds two or three times, breaking his right forearm. According to Mailander, after the final blow, Bonds assumed a submissive position by turning towards the car and placing his hands on the roof. Dautovic then used his ASP baton to strike Bonds on the back of the head, splitting open his scalp and causing an injury that would require seven staples to close. Bonds dived into the car after sustaining the blow. Mailander testified that although Bonds was fully compliant and possibly unconscious, Dautovic struck him two more times as he lay partially in the car. Mailander also delivered a blow. Mailander testified that he delivered blows only to the right side of Bonds's body.

The officers then removed Bonds from the car, ultimately placing him face down on the road. As Bonds lay motionless on the ground, Dautovic struck Bonds in the lower back twice, using what Mailander described as "a downward full swing from a standing position." A witness compared Dautovic's striking motion to chopping wood. Mailander also struck Bonds, this time in the buttocks. The officers

then placed Bonds in handcuffs. Mailander called dispatch and began directing traffic around Bonds, whose head was "on the centerline or slightly over the centerline." One witness testified that she drove "up on the median so we didn't run over this kid's head." Bonds and Evans were arrested, and Bonds was taken by ambulance to the hospital.

Bonds suffered serious injuries. As mentioned above, his right forearm was broken and his head injury required seven staples. Bonds suffered bruising on his head, right thigh, buttocks, and back. His left hand was broken so badly that two bones protruded through his skin. Despite the surgery he underwent to repair his hand, Bonds testified that it does not function as well as it should.

Dautovic wrote an incomplete and inaccurate police report following the incident. The report stated that Bonds exited the car and "took a fighting stance toward [Dautovic]." Further, it stated that the officers struck Bonds across the shoulders when "he got away from us" and explained that Bonds was struck in the head because he ducked. Mailander testified that the report also seemed to indicate that "after Bonds had been struck, he was still aggressive and still fighting when, in fact, that part had happened previously." The report said nothing about the strikes that were delivered when Bonds was lying partially in Evans's car or when he was lying on the ground.

Bonds and Evans were charged with interfering with a police officer. Bonds was also charged with assaulting a police officer. They were tried in state court, where Dautovic and Mailander offered perjured testimony. Ultimately, a jury acquitted Bonds and Evans of the charges against them.

As set forth above, Dautovic was charged with using excessive force against Bonds and obstructing justice.[1] He was found guilty of both counts after a four-day jury trial. A presentence investigation report (PSR) was prepared before sentencing. The PSR grouped the two counts together and determined that the base offense level was 14. See United States Sentencing Guidelines (U.S.S.G. or Guidelines) §§ 2H1.1(a)(1), 2A2.2(a). The PSR then increased the offense level by four levels because a dangerous weapon was used, see U.S.S.G. § 2A2.2(b)(2)(B), and by seven levels because the victim sustained permanent or life-threatening bodily injury, see U.S.S.G. § 2A2.2(b)(3)(C). Because the cumulative adjustments from the application of U.S.S.G. § 2A2.2(b)(2) and (3) cannot exceed ten levels, the PSR decreased the offense level by one. The PSR then applied a two-level enhancement because the victim was physically restrained in the course of the offense, see U.S.S.G. § 3A1.3, a six-level enhancement because the offense was committed under the color of law, see U.S.S.G. § 2H1.1(b)(1), and a two-level enhancement for obstruction of justice, see U.S.S.G. § 3C1.1. The PSR determined that Dautovic's total offense level was 34, his criminal history category was I, and his advisory Guidelines range was 151 to 188 months' imprisonment. The excessive force count carried a ten-year statutory maximum term of imprisonment. 18 U.S.C. § 242. The obstruction of justice count carried a twenty-year statutory maximum. Id. § 1519.

The district court applied all but one of the enhancements set forth in the PSR. The district court did not apply the seven-level enhancement for permanent or life-threatening bodily injury and instead applied the five-level enhancement for serious bodily injury, see U.S.S.G. § 2A2.2(b)(3)(B). The district court denied a requested downward departure based on the claim that the victim's conduct provoked the offense behavior, see U.S.S.G. § 5K2.10. It explained that a victim provocation departure seemed to be "a second bite at the trial apple. The essence of this crime focuses on the resistance of the victim and the force used against [him], and I see that

---

[1]Mailander pleaded guilty to obstruction of justice.

-7-

as . . . the defense in this case which was rejected beyond a reasonable doubt by the jury." Accordingly, the district court determined that Dautovic's total offense level was 33 and that his advisory Guidelines range was 135 to 168 months' imprisonment.

The district court rejected the advisory Guidelines range, specifically calling into question the six-level color-of-law enhancement. The district court remarked that that enhancement "adds 65 months to the recommended sentencing simply because it was under color of law. There's only one other instance I can think of where the guidelines so quickly ratchet up a recommended sentence to the statutory maximum, and that would be the child pornography guidelines." The district court found that "[g]uidelines in this case that exceed the statutory maximum for Count 1 are unreasonable, and I reject them as a basis for imposing sentence here."

The district court then heard from the parties. Dautovic had explained at trial that he was born in Srebrenica, Bosnia, and that his family moved to Sarajevo when he was twelve, after the army occupied Srebrenica. The Bosnian War lasted from 1992 to 1995, and Dautovic's father was killed in the genocide that accompanied the war. Dautovic lived in a refugee camp before relocating to the United States at age fifteen. Dautovic learned English, graduated from high school and college, and became a United States citizen. Dautovic graduated from the Des Moines Police Academy in December 2007 and thereafter completed eight weeks of field training.

The psychiatrist who testified at sentencing had done extensive work with survivors of the Bosnian War and had completed a two-hour interview with Dautovic. He testified that Dautovic's experience in Bosnia had caused "an excessive fear response," which the expert described as being "like a switch flipped in [Dautovic's] brain and he went from zero to a hundred, you know, in an instant." The expert explained that Dautovic's exposure to extreme levels of trauma between the ages of nine and twelve "and then [his] continued adversity afterwards leading up to his resettlement here in Iowa, it changed his brain and it changed the way he looks at the

world." On cross-examination, however, the expert acknowledged that Dautovic denied any wrongdoing: "He told me he thought that he was doing his job, thought he was doing the right thing."

After hearing argument from the parties, the district court considered the sentencing factors set forth in 18 U.S.C. § 3553(a). It found Dautovic's offense conduct to be serious:

> We didn't submit this case to the jury on a claim that someone made a bad mistake one night. We didn't submit it on a claim of negligence, a failure to use ordinary care. We submitted this case on a claim of an intentional deprivation of civil rights. . . . These were just young people coming home from the movies. They did not deserve what happened here.

> After I heard the evidence, I was quite certain that the jury was going to convict you for both of these offenses.

In considering a just punishment, the district court expressed concern that a sentence within the advisory Guidelines range would "approach or exceed the statutory maximum for a first time offense[.]" The district court found that Dautovic presented little risk of committing further crimes, because he had no criminal history and was no longer a police officer. The district court "weighed heavily the need to avoid unwarranted sentencing disparity among defendants with similar records or lack thereof who have been convicted of similar conduct." In doing so, it considered Dautovic's sentencing memorandum, wherein he set forth the U.S. Sentencing Commission's statistics for civil rights offenses for the years 2008 to 2012. The average length of sentence for those years ranged from 22.5 months to 39.1 months (mean) and from 8 months to 14.5 months (median). The district court also acknowledged that Dautovic's conduct was somewhat of an aberration, in light of

"the good things that [he had] done for the community, the good family member that [he had] been[.]"

The district court was troubled by the fact that Dautovic "show[ed] no remorse for what [he had] done[.]" The district court considered Dautovic's personal history, but it could not relate his experience in Bosnia to his actions in the early morning hours of September 13, 2008. The district court remarked that Dautovic did not "claim anything inappropriate happened, so it's hard to tie those two together in light of that." The district court agreed that the situation went from "zero to a hundred," noting that Dautovic and Mailander "were in over their head. As the excitement level rose, more experienced heads would have prevailed, but this one certainly got out of control very, very quickly."

Ultimately, the district court "conclude[d] that the guideline sentencing system inadequately addresse[d] the circumstances of this defendant and that the range [was] unreasonable." The district court imposed concurrent 20-month sentences on both counts of conviction, finding that a 20-month term of imprisonment was "sufficient but not greater than necessary to address the essential sentencing considerations."

II.

We review the substantive reasonableness of a sentence under an abuse of discretion standard. Gall v. United States, 128 S. Ct. 586, 591 (2007). In doing so, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Id. at 597. Although we may not apply a presumption of unreasonableness to a sentence outside the Guidelines range, we may consider the extent of any deviation. Id. If the district court "decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. We cannot "require[] 'extraordinary' circumstances to justify a

-10-

sentence outside the Guidelines range." Id. at 595. Nor can we use "a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Id. Our review of the substantive reasonableness of a variance is thus narrow and deferential, for we must give "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. at 597.

"The federal courts of appeals review federal sentences and set aside those they find 'unreasonable.'" Rita v. United States, 551 U.S. 338, 341 (2007). We have not yet comprehensively defined the considerations that govern appellate review of a sentence's substantive reasonableness. United States v. Kane, 639 F.3d 1121, 1136 (8th Cir. 2011). We have agreed with our sister circuits, however, that "substantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions." Id. (quoting United States v. Irey, 612 F.3d 1160, 1194 (11th Cir. 2010) (en banc) (collecting cases)).

We conclude that the district court imposed a substantively unreasonable sentence in this case. Dautovic's offense conduct was egregious. A police officer beat an innocent victim with a dangerous weapon, causing serious bodily injury and permanent physical damage. He arrested Bonds and Evans and then wrote a false police report that caused them to be charged with crimes. At Bonds and Evans's trial, where they were found innocent, Dautovic committed perjury. Dautovic maintained throughout his trial that his actions in the early morning hours of September 13 were reasonable and that his police report was sloppy, not intentionally falsified. A jury, however, found him guilty beyond a reasonable doubt of using excessive force and obstructing justice, and the district court's findings at sentencing were consistent with the jury's verdict. The district court found that Dautovic showed no remorse and that his experience in Bosnia did not relate to his beating of Bonds.

-11-

The district court, nonetheless, varied downward from the bottom of the Guidelines range by 115 months. The district court found that Dautovic overreacted during the arrest and beating of Bonds. It disagreed with the Guidelines range because it believed that the color-of-law enhancement added too many months to the sentencing range and because the sentencing range exceeded the statutory maximum term of imprisonment for the excessive force count. It found that a Guidelines-range sentence was inappropriate in light of the fact that Dautovic was a first time offender who had done good things for his community and family. The district court acted within its discretion when it decided to vary downward based on Dautovic's history and characteristics and on its policy disagreement with the Guidelines, but these considerations do not justify the imposition of a 20-month sentence in this case.

The district court's justification for the variance fails to support the degree of the variance in this case. To the extent the district court tried to avoid unwarranted sentence disparities by basing Dautovic's sentence on the average sentence imposed for civil rights violations, we are not convinced that the U.S. Sentencing Commission surveyed defendants whose records and offense conduct were similar to Dautovic's. See 18 U.S.C. § 3553(a)(6) (requiring the district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Section 242 criminalizes a variety of offense conduct, ranging from nonviolent misdemeanors to violent felony offenses, but the statistics addressed only civil rights violations in general, not offense conduct.[2]

---

[2]According to the Sentencing Commission's report, the civil rights category includes the following types of violations:

> interference with rights under color of law; force or threats to deny benefits or rights; obstructing an election or registration; manufacture, etc. – eavesdropping device; other deprivations/discrimination; obstructing correspondence; peonage, servitude, and slave trade; intercept communication or eavesdropping; and conspiracy to deprive individual of civil rights.

Dautovic's offense conduct involved aggravating circumstances, including the use of a dangerous weapon, the physical restraint of Bonds during the course of the beating, and the infliction of serious injury. Moreover, acting under the color of law, Dautovic tried to conceal his wrongdoing by falsifying a police report and lying under oath.

When the totality of the circumstances is considered, a variance from the Guidelines range of 135 to 168 months' imprisonment to a 20-month sentence is unreasonably lenient. The district court erred in weighing the § 3553(a) factors and abused its discretion in varying downward to the extent that it did. See Kane, 639 F.3d at 1136 (holding that the sentence was "the product of unreasonable weighing decisions and is, therefore, substantively unreasonable"). Accordingly, we vacate the sentence and remand for resentencing.[3]

We have considered and deny Dautovic's cross-appeal. The district court did not err in applying the two-level enhancement for physical restraint. See United States v. Kirtley, 986 F.2d 285, 286 (8th Cir. 1993) (per curiam) ("[A] defendant physically restrains persons if the defendant creates circumstances allowing the persons no alternative but compliance."). Nor did the district court err in denying a downward departure for victim provocation. See Blankenship v. United States, 159 F.3d 336, 339 (8th Cir. 1998) ("A section 5K2.10 motion for downward departure is warranted when the victim's behavior significantly contributed to provoking the behavior of the offense[.]" (emphasis omitted)).

United States Sentencing Commission Final Quarterly Data Report app. A 7 (2011), *available at* www.ussc.gov.

[3]On remand, the district court is directed to address both counts of conviction. From its explanation, we cannot discern whether or how Dautovic's obstruction of justice conviction was considered in the imposition of sentence.

## III.

The sentence is vacated, and the case is remanded for resentencing consistent with the views set forth in this opinion.

_____